IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MAYKEL TRUJILLO ARAYA,

     Petitioner,

     v.                            CASE NO.  20-3234-JWL

ROBERT GUADIAN, et al.,

     Respondents.

## MEMORANDUM AND ORDER

This matter is a petition for writ of habeas corpus filed under 28 U.S.C. § 2241. Petitioner is detained under an order of removal entered by the immigration court in in Eloy, Arizona.  Petitioner is currently detained at the Chase County Jail in Cottonwood Falls, Kansas, on the authority of the Enforcement and Removal Operations ("ERO"), ICE, a sub agency of the U.S. Department of Homeland Security ("DHS").  Petitioner seeks immediate release from custody, asserting that his continued detention pending removal has exceeded the six-month period considered presumptively reasonable.  The Court issued an Order to Show Cause (Doc. 2), Respondent filed an Answer and Return (Doc. 3), and Petitioner filed a Traverse (Doc. 4).

## I.  Background

Petitioner is a native and citizen of Cuba.  (Doc. 3–1, Declaration of Deportation Officer Katy A. Casselle, ¶ 5) ("Casselle Decl.").  Petitioner first entered the United States on July 29, 2019, at the DeConcini Port of Entry at Nogales, Arizona, to seek admission into the United States.  Casselle Decl., ¶ 6.  An officer with Customs and Border Protection ("CBP") referred Petitioner to the Passport Control Unit for further processing.  *Id.*  During the secondary interview, a sworn statement was conducted.  Upon completion of the interview and sworn

statement, Petitioner was found to be inadmissible into the United States pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I).  Casselle Decl., ¶ 7.

On July 29, 2019, Petitioner was issued a Notice to Appear ("NTA", Form I-862), placing him in removal proceedings before the Immigration Judge.  Casselle Decl., ¶ 8.  CBP determined Petitioner to be an arriving alien and detained him without bond pursuant to 8 U.S.C. § 1225(b)(2)(A);[1] *see also* 8 C.F.R 1003.19(h)(2)(i)(B).[2]  *Id.*   On July 30, 2019, ERO took custody of Petitioner and placed him in the Eloy Federal Contract Facility, Eloy, Arizona. Casselle Decl., ¶ 10.

***Removal Proceedings***

On or about July 31, 2019, the NTA was filed by the ICE Office of the Principal Legal Advisor ("OPLA") with the Eloy Immigration Court and removal proceedings began.[3]  Casselle Decl., ¶ 11.  On August 20, 2019, Petitioner appeared before the Immigration Judge in Eloy, Arizona for his initial master calendar hearing. Casselle Decl., ¶ 12. The Immigration Judge sustained the charge of inadmissibility.  *Id.*   After discussing preliminary matters with the parties, the Immigration Court rescheduled the matter for a merits hearing on October 28, 2019. *Id.*

On September 9, 2019, Petitioner appeared before the Immigration Judge in Eloy, Arizona.  Casselle Decl., ¶ 13. The Immigration Court rescheduled the matter in order to obtain fingerprints in support of Petitioner's application for relief.  *Id.*   On November 18, 2019, Petitioner appeared before the Immigration Judge for a hearing on the merits of his application

---

[1] Arriving alien is defined in 8 C.F.R. § 1.2 and § 1001.1(q).

[2] For context, CBP officers are stationed at the Ports of Entry.  A primary function of CBP is to inspect and admit persons entering into the United States.  Casselle Decl., ¶ 9.  When a person is found to be inadmissible due to applicable laws governing the entry into the United States, CBP officers are charged with denying entry, or detaining those persons until a judicial review of the persons' case can be completed.  *Id.*  Due to the limited amount of available jail space, CBP will typically turn over individuals who need to remain detained to ICE ERO, who will then detain those persons and monitor their case to ensure the proper judicial review process is completed.  *Id.*

[3] OPLA serves as the exclusive representative of DHS in immigration removal proceedings.

for relief.  Casselle Decl., ¶ 14.  At the conclusion of the hearing, the Immigration Judge issued a decision denying Petitioner's application for relief and ordered him removed to Cuba. *Id.* Petitioner reserved the right to appeal, which provided him with 30 days from the date of the decision to file an appeal.  *Id.*

On or about December 16, 2019, Petitioner filed an appeal with the Board of Immigration Appeals ("BIA").  Casselle Decl., ¶ 15.  On or about January 29, 2020, the Petitioner submitted a motion to withdraw his appeal with the BIA.[4]  Casselle Decl., ¶ 16.  On February 28, 2020, the BIA issued a decision that there would be no further action, due to the withdrawal of the appeal. Casselle Decl., ¶ 17.

### *Post-Removal Order*

Pursuant to 8 U.S.C. § 1231(a)(1)(A), an alien who has been ordered removed, shall be removed from the United States within 90 days.  Casselle Decl., ¶ 18.  At or near 90 days post removal order, if an alien has not been removed, ERO conducts a File Custody Review, also known as a Post-Order Custody Review ("POCR"), to determine the necessity of continued custody.  *Id.*   When conducting a 90-day POCR, some factors that are considered are the following: a detained individual's flight risk, any danger the individual may pose to his or her community, threat to national security, and whether there is significant likelihood of removal in the reasonably foreseeable future ("SLRRFF").  *Id*.    Based on this information, a recommendation will be made to management as to whether the individual should remain in custody. *Id.* Those managers, including the Supervisory Deportation and Detention Officer, Assistant Field Office Director, Deputy Field Office Director and the Field Office Director, will either concur in the assessment to continue detention or request release of the alien. *Id.*

---

[4] The Petitioner previously submitted a handwritten letter to the BIA requesting that his appeal be cancelled.  The letter was received by the BIA on December 26, 2019.

In cases where an alien has been detained pursuant to a final order of removal for 180 days, a Transfer Checklist will be completed with information related to follow-up actions taken to obtain a travel document after the initial 90-day POCR and every 90 days thereafter.  Casselle Decl., ¶ 19.  The Transfer Checklist contains information, such as the alien's biographical information, whether there is a judicial stay in effect, whether there is a habeas petition pending at the time of review, whether the particular case is a national security case, whether the alien has medical or psychological issues, and whether and how often an Embassy person has been contacted for the status of a travel document. *Id.* This checklist is then transferred to the ICE/ERO Headquarters POCR Unit, which makes the ultimate decision on the individual's continued detention beyond the 180 days, or every 90 days thereafter, based on the SLRRFF. *Id.*

On March 9, 2020, Petitioner was transferred by ERO to the Kankakee County Jail, in Kankakee, Illinois. Casselle Decl., ¶ 20.  On March 27, 2020, Petitioner was served with a Warning for Failure to Depart (Form I-229(a)).  Casselle Decl., ¶ 21.  On April 6, 2020, ERO Chicago submitted a Cuban Repatriation Request to the International Operations Division ("IOD") with ICE Headquarters.  Casselle Decl., ¶ 22.

On April 7, 2020, Petitioner was transferred by ERO to the Pulaski County Jail, in Ullin, Illinois, pending transfer to Kansas.  Casselle Decl., ¶ 23.  On April 8, 2020, Petitioner was transferred by ERO to the Chase County Jail, in Cottonwood Falls, Kansas.  Casselle Decl., ¶ 24. This transfer took place as a precautionary measure due to COVID-19. *Id.* Detainees were transferred to jails with available bed space that were projected to be less at risk for COVID-19. *Id.*

On April 10, 2020, IOD submitted a request to Cuba for Petitioner's repatriation. Casselle Decl., ¶ 25.  On April 29, 2020, Petitioner was served with a Warning for Failure to

depart (Form I-229(a)) and a Notice to Alien for File Custody Review, indicating that his custody status would be reviewed on or about May 28, 2020.  Casselle Decl., ¶ 26.  During the File Custody Review, an alien can submit any evidence that would support their argument for release from ICE custody.  *Id*.  ERO provides an alien with a Notice to Alien for File Custody Review so they are aware of the process for review and have sufficient time to obtain any documentation they wish to submit. *Id.*

On May 14, 2020, ERO emailed IOD, requesting an update on the status of the pending repatriation request.  Casselle Decl., ¶ 27.  IOD stated that repatriation is very likely, and they are awaiting a response from Cuba. *Id.*

On May 24, 2020, DO Steven Scrivner conducted a telephonic interview with Petitioner and conducted a POCR.  Casselle Decl., ¶ 28.  The POCR worksheet was submitted through the chain of command for a determination on Petitioner's custody.  *Id.*  On June 17, 2020, DO Scrivner requested an update from supervision regarding the pending POCR determination.  Casselle Decl., ¶ 29. The original POCR worksheet was resubmitted through the chain of command.  *Id.*  Due to the pending repatriation request, a determination was made to continue detention.  *Id.*  This decision was served on Petitioner by DO Ana Forero on June 17, 2020.  *Id.*

On June 17, 2020, ERO emailed IOD, requesting an update on the status of the pending repatriation request. Casselle Decl., ¶ 30. IOD stated that the repatriation request remains pending with Cuba.  *Id.*  On July 6, 2020, ERO emailed IOD, requesting an update on the status of the pending repatriation request.  Casselle Decl., ¶ 31.  IOD stated that the repatriation request remains pending with Cuba, and this case has SLRRFF.  *Id.*

On July 8, 2020, Petitioner was served with a Notice to Alien of Interview for Review of Custody Status, indicating that he would be interviewed on July 10, 2020.  Casselle Decl., ¶ 32.

On July 10, 2020, DO Alan Vanskike and DO Jerry Gariety conducted an interview with Petitioner.  Casselle Decl., ¶ 33.  On July 13, 2020, DO Vanskike and DO Gariety submitted a memo, recommending continued detention.  Casselle Decl., ¶ 34.  This memo was signed on August 27, 2020 by Deputy Field Office Director ("DFOD") Jose L. Zamora, concurring with the recommendation made by DO Vanskike and DO Gariety.  *Id.*

On August 7, 2020, ERO emailed IOD, requesting an update on the status of the pending repatriation request. Casselle Decl., ¶ 35.  IOD stated that the repatriation request remains pending with Cuba. *Id.*

On August 21, 2020, DO Forero completed a Transfer Checklist and submitted the checklist and supporting documentation to the ICE POCR Unit for 180-day POCR.  Casselle Decl., ¶ 36.

On September 4, 2020, ERO emailed IOD, requesting an update on the status of the pending repatriation request.  Casselle Decl., ¶ 37.  IOD stated that the repatriation request remains pending with Cuba.  *Id.*

On September 19, 2020, ERO emailed the ICE POCR Unit, requesting an update regarding the pending 180-day POCR determination.  Casselle Decl., ¶ 38.  On September 23, 2020, ICE POCR Unit responded to ERO with a copy of the Decision to Continue Detention that had been issued on September 14, 2020.  Casselle Decl., ¶ 39.  On September 24, 2020, the Decision to Continue Detention was served on Petitioner by DO Ana Forero.  Casselle Decl., ¶ 40.

On October 13, 2020, IOD notified ERO that Cuba has approved Petitioner's repatriation. Casselle Decl., ¶ 41.  Airport operations in Havana, Cuba were to remain closed until at least October 31, 2020 due to COVID-19.  *Id.*  Respondents asserted that once airport operations in

Havana, Cuba resume, ERO will move forward with Petitioner's repatriation. *Id.*

### *Habeas Petition*

Petitioner filed the instant Petition under 28 U.S.C. § 2241, seeking immediate release from custody, asserting that his continued detention pending removal has exceeded the six-month period considered presumptively reasonable.  In their pleadings, the parties indicated that although Cuba had approved Petitioner's repatriation, his removal was delayed because airport operations were closed in Havana, Cuba due to the coronavirus pandemic.  Because recent news outlets suggested that the Havana airport began receiving flights from the United States on November 15, 2020, the Court directed the parties to submit a status report by December 18, 2020, indicating whether or not flights to Cuba are now available, how this impacts the delay in Petitioner's removal, and whether or not there is a significant likelihood of removal in the reasonably foreseeable future.  (Doc. 5.)    The parties filed a joint status report (Doc. 6) on December 18, 2020.

In the Status Report, the parties acknowledge that airport operations in Havana, Cuba resumed on November 15, 2020, and that the IOD at ICE Headquarters notified ERO on December 8, 2020, that they were actively working with the Cuban government on how to proceed with removals.  Although ICE is negotiating with the Cuban government to allow for removal flights to resume, no removal flights had been scheduled as of that date.

## II.  Discussion

To obtain habeas corpus relief, a petitioner must demonstrate that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S. C. § 2241(c)(3). The federal district courts have habeas corpus jurisdiction to consider the statutory and constitutional grounds for immigration detention that are unrelated to a final order of removal.

*Demore v. Kim*, 538 U.S. 510, 517–18 (2003); *see also Soberanes v. Comfort*, 388 F.3d 1305, 1310 (10th Cir. 2004) ("Challenges to immigration detention are properly brought directly through habeas.") (citing *Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001)).

Under 8 U.S.C. § 1226, the Attorney General may arrest and detain an alien pending a determination of whether the alien is to be removed from the United States.  Detention during this "pre-removal period" is considered definite because it terminates upon the immigration court's removal decision.  *Demore*, 538 U.S. at 529.  Upon the entry of a final removal order, the matter enters the "removal period," and the statutory authority for detention shifts to 8 U.S.C. § 1231.  Under § 1231, the removal period begins on the latest of:  (1) the date the order of removal becomes administratively final; (2) if the removal order is judicially reviewed, and the court orders a stay of removal, the date of the court's final order; or (3) if the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.  8 U.S.C. § 1231(a)(1)(B).  An order of removal is administratively final upon the earlier of "a determination by the Board of Immigration Appeals affirming such order" or "the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals."  8 U.S.C. § 1101(a)(47)(B).

After an order of removal becomes administratively final, the Attorney General "shall detain the alien" during the 90-day removal period established under 8 U.S.C. § 1231(a)(2).  *See Zadvydas*, 533 U.S. at 683; *Morales-Fernandez v. INS*, 418 F.3d 1116, 1123 (10th Cir. 2005). Generally, the government is required to remove the alien held in its custody within the 90-day removal period.  *See* 8 U.S.C. § 1231(a)(1)(A)–(B).

While the government may detain an "inadmissible" or criminal alien beyond the statutory removal period, *see* 8 U.S.C. § 1231(a)(6),[5] the government may not detain such an alien indefinitely. *Zadvydas*, 533 U.S. at 699. Instead, the detention of an alien subject to a final order of removal for up to six months is presumptively reasonable in view of the time required to accomplish removal. *Id.* at 701. Beyond that period, if the alien shows that there is "no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* Furthermore, as the period of detention grows, "what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.* The six-month presumption does not mean that every alien must be released after that time, but rather an alien may be detained "until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

The order for Petitioner's removal became administratively final on February 28, 2020. Although Petitioner has been detained in excess of the presumptively reasonable six-month period, he must show that there is no significant likelihood of removal within the reasonably foreseeable future.

Petitioner met the initial burden under *Zadvydas* by showing, at the time he filed this action on September 15, 2020, that he had been held for more than six months following the order of removal without any significant likelihood of removal in the reasonably foreseeable future. Petitioner argued in his Petition that Cuba had closed its doors to all travel from the United States due to the COVID-19 pandemic. (Doc. 1, at 3–4.) In his Traverse, Petitioner

---

[5] Section 1231(a)(6) provides that:
> An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order or removal, may be detained beyond the removal period and, if released, shall be subject to terms of supervision in paragraph (3).

Petitioner was found to be inadmissible into the United States pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I).

argues that the fact that the Cuban airport will theoretically reopen to deportees and accept his return at some point in time, does not establish that Petitioner's detention in not indefinite. (Doc. 4, at 1.)  Petitioner asserts that "[a] vague possibility without a set date does not make his removal 'significantly likely in the reasonably foreseeable future.'"  *Id*.  Petitioner acknowledged that Cuba has approved his repatriation, but stressed that the Cuban airport remained closed indefinitely.  *Id*. at 2–3  ("It is now November 16 and Cuba's airports are still closed with no end in sight.").  Petitioner argued that Cuba was unlikely to open its doors to detainees from the United States any time soon because of the increase in COVID-19 cases.  *Id*. at 4.  Lastly, Petitioner argued that even if the Cuban airport reopens to flights from the United States, it is unclear if they will accept detainees from the Chase County Jail, which has "77 current confirmed cases among 78 detainees."  *Id*.

The burden therefore shifted to Respondents to rebut that showing.  Respondents have met that burden by showing that Cuba has approved Petitioner's repatriation and the airport in Havana has now opened its operations and is receiving flights from the United States. Furthermore, Petitioner's concerns that he will not be accepted due to the status of COVID-19 cases at the Chase County Jail is unwarranted. The Court notes that Petitioner's alleged numbers do not accurately reflect the situation at the Chase County Jail during this timeframe.  On November 30, 2020, the Court entered a Memorandum and Order in *Cruz v. Guadian*, Case No. 20-3284-JWL, addressing the same argument and finding that: "data maintained by ICE and available online indicates that as of November 26, 2020, the CCJ had 15 confirmed cases of COVID-19 currently under isolation or monitoring, no detainee deaths, and 79 total confirmed cases since testing began in February 2020."  *Id*. at Doc. 5, at 5, 14 (finding that "[t]his is vastly

different than Petitioner being "the only inmate who hasn't tested positive" at the CCJ.).
Petitioner also alleged in the Petition that he had already contracted COVID-19. (Doc. 1, at 4.)

Because there is a significant likelihood of removal in the reasonably foreseeable future,
the Court finds that Petitioner is not entitled to habeas corpus relief at this time. However, the
Court directs the parties to file status reports with the Court by January 21, 2021.

**IT IS THEREFORE BY THE COURT ORDERED** that the parties shall file a joint
status report or separate status reports by **January 21, 2021.**

**IT IS SO ORDERED**.

**Dated December 22, 2020, in Kansas City, Kansas.**

> **S/ John W. Lungstrum**
> **JOHN W. LUNGSTRUM**
> **UNITED STATES DISTRICT JUDGE**